J-S32043-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DEVEN TYLER KOHR | : | |
| | : | |
| Appellant | : | No. 184 MDA 2023 |

Appeal from the PCRA Order Entered January 4, 2023
In the Court of Common Pleas of Cumberland County Criminal Division at
No(s):  CP-21-CR-0003593-2016

BEFORE:  DUBOW, J., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED:  DECEMBER 28, 2023**

Appellant Deven Tyler Kohr appeals from the order denying his timely first Post Conviction Relief Act[1] (PCRA) petition.  Appellant argues that his trial counsel, John Shugars, Esq. (trial counsel) was ineffective for failing to properly question witnesses and providing erroneous advice to Appellant concerning his juvenile record, which interfered with his right to testify in his own defense at trial.  After careful review, affirm.

A prior panel of this Court summarized the relevant facts and procedural history of this matter as follows:

> On May 14, 2016, [Appellant] called 911 after finding his daughter, six-month-old Desirae Kohr [(Victim)], unresponsive and not breathing.  When police arrived, Kevinlee Kirsch, [Victim's] grandfather, was in the process of administering CPR. [Victim] was transported to Harrisburg Hospital by ambulance,

---

[1] 42 Pa.C.S. §§ 9541-9546.

along with [Appellant]. At the hospital, [Victim] never regained consciousness, and was declared dead.

Two days prior to her death, on May 12, 2016, [Appellant] and Paula Kirsch [(Mother)], noticed that [Victim] seemed to be ill. Specifically, [Victim] was sleeping more than normal and vomiting. [Mother] took her to a physician who advised her it was likely a "bug." The physician instructed [Mother] to keep [Victim] hydrated with Pedialyte.

Even though [Victim] was sick, [Mother] decided to travel to New Jersey the day following [Victim's] doctor's appointment, as earlier in the year she had made plans to celebrate her sister's twenty-first birthday in Atlantic City that weekend. While initially reluctant to follow through with her plans, she ultimately did go, and left her children in [Appellant's] care. [Mother's] decision to go to Atlantic City upset [Appellant] for various reasons, including his concerns of potential infidelity; however, he insisted on watching the children.

On the evening of May 14, 2016, [Appellant] called [Mother] to inform her that [Victim] was not breathing. [Mother] told [Appellant] to call an ambulance and left New Jersey for Pennsylvania almost immediately. While *en route* to Pennsylvania, [Mother] was unable to contact [Appellant] despite numerous attempts; she then tried calling Kevinlee, who was unreachable due to an uncharged cell phone battery. Eventually, [Mother] contacted Josh, her sister's boyfriend, who in turn informed Kevinlee what had happened. While the three men — [Appellant], Kevinlee, and Josh — were in the home at the time of the event, [Appellant] was the only adult present in the room when [Victim] became unresponsive.

Matthew Stoner, the Chief Deputy Coroner for the Cumberland County Coroner's Office, responded to Harrisburg Hospital, where he pronounced [Victim] dead from her injuries. The family was subsequently instructed not to remove the endotracheal tube inserted in [Victim's] mouth, even though she was no longer alive; [Appellant] removed it anyway. After talking to the family, members of the New Cumberland Borough Police Department and the coroner returned to the house to attempt to develop a better understanding of what had happened prior to [Victim's] death. While in the home, officers found unopened Pedialyte on the kitchen counter. Upon noticing the unopened bottle, [Appellant] reached for the bottle to attempt to open it, but was stopped by

one of the officers. [Appellant] then told law enforcement that he had given [Victim] a Pedialyte popsicle, instead of the actual Pedialyte.

Dr. Wayne Ross, a forensic pathologist with the Cumberland County Coroner's Office, performed an autopsy on [Victim's] body. Dr. Ross concluded, within a reasonable degree of medical certainty, that her death was caused by suffocation or traumatic asphyxiation. While performing the autopsy, Dr. Ross found rib impressions on [Victim's] liver, as well as congestion or bleeding, suggesting her chest was compressed down to her liver before she died. He also found bleeds in her head that ranged from zero to eight days old. These bleeds were consistent with injuries from high forces of deceleration from actions such as throwing the child into the bed. Dr. Ross further testified that traumatic brain injury could be the cause of nausea and vomiting, and that there was no indication that [Victim] was ill.

Sergeant Caroline Weber interviewed the family members individually after [Victim]'s death. Upon being confronted with the autopsy report and cause of death, [Appellant] revealed to Sergeant Weber that he dropped [Victim] in her swing and she hit her head. He said that he then picked her up and squeezed her. [Appellant] said that he thought that "the squeezing of her is what did it to her." However, Dr. Ross testified that this explanation was neither scientifically nor medically possible.

[Appellant] was arrested and charged with murder (first and third degree), aggravated assault, [endangering the welfare of a child (EWOC)], and simple assault.[FN1] The case proceeded to a jury trial, and, on November 3, 2017, the jury found [Appellant] guilty of third-degree murder, EWOC, and simple assault.[FN2] With regard to the charge of EWOC, the jury specifically determined [that Appellant] was guilty of engaging in a "course of conduct." On January 23, 2018, the trial court sentenced [Appellant] as follows: (1) on the count of third-degree murder, a term of 20 to 40 years' imprisonment; (2) on the count of [EWOC], a consecutive term of two to five years' imprisonment; and (3) on the count of simple assault, a concurrent term of one to two years' imprisonment.

[FN1] *See* 18 Pa.C.S. §§ 2502(a) and (c), 2702(a)(1), 4304(a)(1), and 2701(a)(1), respectively.

[FN2] The jury found [Appellant] not guilty of first-degree murder and aggravated assault.

- 3 -

> [Appellant] filed a timely post-sentence motion in which he (1) challenged the sufficiency of the evidence supporting his convictions, (2) asserted the Commonwealth committed prosecutorial misconduct and deprived him of a fair trial, and (3) requested the court modify or reconsider his sentence. Following argument on March 2, 2018, the trial court entered an order finding [Appellant's] prosecutorial misconduct and fair trial claims waived. After reviewing briefs by the parties on the remaining issues, the trial court entered an order and opinion on July 5, 2018, denying [Appellant's] post-sentence motions.

*Commonwealth v. Kohr*, 1252 MDA 2018, 2019 WL 2486762, at *1-2 (Pa. Super. filed Jun. 14, 2019) (*Kohr I*) (unpublished mem.) (footnote and citations omitted and some formatting altered). Appellant filed a timely appeal, and this Court affirmed Appellant's judgment of sentence. *See id.* at *9. Our Supreme Court denied Appellant's petition for allowance of appeal on November 19, 2019. *See Commonwealth v. Kohr*, 220 A.3d 531 (Pa. 2019) (*Kohr II*).

Appellant filed a timely *pro se* first PCRA petition on September 25, 2020. The PCRA court appointed Jacob Jividen, Esq., to represent Appellant, and Attorney Jividen filed a counseled PCRA petition on February 3, 2021. On March 24, 2021, the PCRA court vacated the appointment of Attorney Jividen and appointed William Braught, Esq., to represent Appellant. On August 9, 2021, Attorney Braught filed an amended PCRA petition. The PCRA court held a hearing on September 22, 2022, and on January 4, 2023, the PCRA court denied Appellant's PCRA petition. This timely appeal followed. Both the PCRA court and Appellant have complied with Pa.R.A.P. 1925.

On appeal, Appellant raises the following issues:

1. Trial [C]ounsel's advice that Appellant's prior juvenile robbery adjudication conviction would be admissible if he were to testify to show that he was a bad and violent person was so unreasonable that Appellant did not and could not have made a knowing and intelligent decision to not testify at trial.

2. Trial [C]ounsel ineffectively cross-examined witnesses in such a manner as to deny Appellant a fair trial and thereby denying his right to due process.

   a. Trial [C]ounsel failed to elicit testimony from [Mother] regarding her medical care, or lack thereof, for [Victim], and to enter into evidence [Victim's] medical records, thus depriving Appellant's jury of this exculpatory information.

   b. Trial [C]ounsel failed to elicit testimony from Wayne Ross, M.D. regarding his claim that [Victim] was blind 24 to 48 hours prior to her death thus depriving Appellant's jury of this exculpatory information.

3. Trial [C]ounsel ineffectively examined Appellant's own witness, Douglas Kohr, in such a manner as to deny Appellant a fair trial and thereby denying his right to due process.

Appellant's Brief at 4 (some formatting altered).

Our standard of review from the denial of a PCRA petition "is limited to examining whether the PCRA court's determination is supported by the evidence of record and whether it is free of legal error." *Commonwealth v. Sandusky*, 203 A.3d 1033, 1043 (Pa. Super. 2019) (citation omitted). This Court applies a *de novo* standard of review to the PCRA court's legal conclusions. *Commonwealth v. Hutchinson*, 25 A.3d 277, 284 (Pa. 2011). A PCRA court's credibility determinations, however, are binding on this Court when such determinations are supported by the record. *Id.*; *see also Commonwealth v. Davis*, 262 A.3d 589, 595 (Pa. Super. 2021) (stating that

"[t]his Court grants great deference to the findings of the PCRA court if the record contains any support for those findings" (citation omitted)).

> [T]o establish a claim of ineffective assistance of counsel, a defendant must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. The burden is on the defendant to prove all three of the following prongs: (1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different.
>
> We have explained that a claim has arguable merit where the factual averments, if accurate, could establish cause for relief. Whether the facts rise to the level of arguable merit is a legal determination.
>
> The test for deciding whether counsel had a reasonable basis for his [or her] action or inaction is whether no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success. Counsel's decisions will be considered reasonable if they effectuated his [or her] client's interests. We do not employ a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken.
>
> Prejudice is established if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
>
> Boilerplate allegations and bald assertions of no reasonable basis and/or ensuing prejudice cannot satisfy a petitioner's burden to prove that counsel was ineffective. Moreover, a failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness.

***Sandusky***, 203 A.3d at 1043-44 (citations omitted and formatting altered).

- 6 -

**Prior Adjudication**

Appellant first argues that trial counsel rendered ineffective assistance by advising Appellant that if he chose to testify, a prior juvenile adjudication for robbery, would be used against him as *crimen falsi*. Specifically, Appellant argues that trial counsel never explained that the *crimen falsi* adjudication could only be used by the jury to assess Appellant's credibility and that the trial court would give the jury an instruction explaining that limitation. *See* Appellant's Brief at 14-16. Appellant asserts that trial counsel's advice was inaccurate and unreasonable, and it precluded Appellant from being able to make a knowing and intelligent decision to waive his right to testify at trial. *See id.* at 15-16.

The Commonwealth contends that trial counsel was not ineffective because he made a reasonable strategic decision and advised Appellant not to testify because the Commonwealth would have cross-examined Appellant regarding contradictory statements he made to the police concerning the source of Victim's fatal injuries. *See* Commonwealth's Brief at 13. The Commonwealth further notes that Appellant's on-the-record colloquy reflects that he voluntarily waived his right to testify. *See id.* at 13-14. Further, the Commonwealth asserts that Appellant testified that the admissibility of his juvenile record was only one factor in his choice not to testify. *See id.* at 14.

This Court has explained:

> The decision of whether or not to testify on one's own behalf is ultimately to be made by the defendant after full consultation with counsel. In order to sustain a claim that

counsel was ineffective for failing to advise the appellant of his rights in this regard, the appellant must demonstrate either that counsel interfered with his right to testify, or that counsel gave **specific advice** so unreasonable as to vitiate a knowing and intelligent decision to testify on his own behalf.

[**Commonwealth v.**] **Nieves**, 746 A.2d [1102,] 1104 [(Pa. 2000)] (internal citations omitted).

[T]he appropriate standard for assessing whether a defendant was prejudiced by trial counsel's ineffectiveness regarding the waiver of his right to testify is whether the result of the waiver proceeding would have been different absent counsel's ineffectiveness, not whether the outcome of the trial itself would have been more favorable had the defendant taken the stand.

**Commonwealth v. Walker**, 110 A.3d 1000, 1005 (Pa. Super. 2015), *appeal denied*, 125 A.3d 777 (Pa. 2015) (emphasis in original).

A trial court is not required to conduct a colloquy to determine whether a defendant has made a knowing, intelligent and voluntary waiver of his right to testify. **Commonwealth v. Todd**, 820 A.2d 707, 712 (Pa. Super. 2003). Nevertheless, a criminal defendant must understand his decision not to testify if not by colloquy, then by the presumed competent advice of counsel. **See id.** (holding appellant's waiver of right to testify was knowing, intelligent and voluntary, where court credited counsel's testimony that he discussed right to testify with appellant on numerous occasions and counsel's advice was reasonable).

**Commonwealth v. Washington**, 269 A.3d 1255, 1264 (Pa. Super. 2022) (*en banc*) (footnote omitted and some formatting altered), *appeal denied*, 283 A.3d 1249 (Pa. 2022).

In **Washington**, the appellant's attorney erroneously advised the appellant not to testify because evidence of a prior conviction for aggravated assault would be admissible, and the jury would hear the details of that prior

conviction. *See Washington*, 269 A.3d at 1261. The appellant's attorney admitted telling the appellant: "I don't want you to get on the stand because the prosecutor could bring up the aggravated assault conviction and then the jury . . . will think you're violent." *Id.* at 1260 (citation omitted). The appellant's attorney failed to advise the appellant that because aggravated assault was not a *crimen falsi*, it would not have been automatically admissible. *Id.* at 1262-63. The attorney "made clear at the PCRA hearing that his advice against testifying was based **solely** on fear of [the a]ppellant's prior aggravated assault conviction coming in for impeachment purposes and the jury hearing details about that offense." *Id.* at 1267 (citation omitted and emphasis in original). Therefore, in *Washington*, the appellant's attorney clearly admitted providing inaccurate and erroneous legal advice. *See id.*

Instantly, we conclude that Appellant's claim is meritless. In his PCRA petition and at the PCRA hearing, Appellant asserted that he would have testified on his own behalf if trial counsel informed him that the Commonwealth's use of the prior adjudication would have been limited. *See* Am. PCRA Pet., 8/9/21, at ¶12; N.T., 9/22/22, at 103-10. At the PCRA hearing, Appellant testified that he believed that his prior adjudication would have been used to show that he had a violent nature, and he was concerned that the jury would hear more facts about the robbery. *See* N.T., 9/22/22, at 106. However, despite Appellant's claim that trial counsel provided incomplete information concerning his prior adjudication, trial counsel credibly rebuffed Appellant's accusation. The PCRA court credited trial counsel's

testimony that counsel could not remember the specifics of the conversation, but that he did discuss with Appellant, the potential positives and negatives of Appellant taking the stand as a witness. *See* N.T., 9/22/22, at 16-18, 73.

Further, the record reflects that the trial court conducted a colloquy addressing Appellant's waiver of his right to testify:

> THE COURT: Yes. Now, [Appellant], I just need to go over a couple of things with you. I trust that you have had ample time to consider whether or not you will take the stand in this case. I know that you have had an opportunity to discuss this with counsel. And now I must make sure that any decision you are making is knowing and voluntary. Initially can you tell me how far you went in school?
>
> [APPELLANT]: Twelfth grade.
>
> THE COURT: Did you graduate high school?
>
> [APPELLANT]: Yes.
>
> THE COURT: And do you understand that you are not required to take the stand and testify in your own behalf?
>
> [APPELLANT]: Yes.
>
> THE COURT: Do you understand that you have a Constitutional right not to take the stand and testify?
>
> [APPELLANT]: Yes.
>
> THE COURT: And do you understand that you may exercise that right for any[]one of a number of reasons?
>
> [APPELLANT]: Yes.
>
> THE COURT: Do you understand that if you decide not to testify, I will instruct the jury that they are not permitted to speculate on your reasons, nor may they draw any inference of guilt or any other adverse inference to you by virtue of the fact that you do not testify?
>
> [APPELLANT]: Yes.

THE COURT: Do you understand everything that I have said so far?

[APPELLANT]: Yes.

THE COURT: Do you have a clear mind today?

[APPELLANT]: Yes.

THE: COURT: And you have been paying attention throughout the case, and making notes and talking with [trial counsel]. Are you under the influence of alcohol or any substance that might impair your ability to make the decision as to whether or not you should testify?

[APPELLANT]: No.

THE COURT: Have you had sufficient time to discuss this matter with [trial counsel]?

[APPELLANT]: Yes.

THE COURT: **Do you understand that ultimately it is your decision as to whether or not you should testify and not [trial counsel's]?**

[APPELLANT]: **Yes.**

THE COURT: **Knowing all of this, have you personally reached a decision regarding your desire to testify?**

[APPELLANT]: **Yes.**

THE COURT: **And what is your intention?**

[APPELLANT]: **I will not.**

THE COURT: [Trial counsel], anything you want to add to that?

[APPELLANT]: No, Judge. Other than that my client and I had discussed it. That was my recommendation to him as well. I am not going to get into any individual discussion.

THE COURT: Then, [Appellant], I find that your decision not to testify was made knowingly and voluntarily after you had this opportunity to discuss that with your counsel.

N.T. Trial, 10/30/17-11/3/17, at 451-454 (emphases added). Appellant testified unequivocally that he was voluntarily waiving his constitutional right to testify and understood that ultimately, it was his decision to make, and not for counsel to decide. *See id.*

After review, we conclude that Appellant's baseless allegations are insufficient to support his claim that trial counsel interfered with his right to testify. *See Commonwealth v. Baker*, 507 A.2d 872, 874 (Pa. Super. 1986) (stating that "self-serving or uncorroborated statements on petitioner's behalf do not shift and do not necessarily sustain petitioner's burden of proof, even when the Commonwealth presents no rebuttal evidence" (citation omitted)). Nothing in this record supports the conclusion that trial counsel's specific advice was so unreasonable that it precluded Appellant from making a knowing and intelligent decision concerning whether to testify. *See Nieves*, 746 A.2d at 1104. Therefore, Appellant's claim is meritless. Accordingly, Appellant is not entitled to relief.

## Cross-examination

Next, Appellant argues that trial counsel was ineffective in his cross-examination of two witnesses. Appellant claims that Mother was Victim's primary care giver, and proper cross-examination could have cast Mother as an alternate suspect. Appellant's Brief at 18. Further, Appellant argues that trial counsel failed to elicit testimony from Dr. Ross that Victim's primary physician did not document Victim's blindness the day prior to her death. *Id.* at 20.

We note that "[t]he scope and vigor of cross-examination is a matter which falls within the ambit of sound trial strategy to be exercised by trial counsel alone." ***Commonwealth v. Molina***, 516 A.2d 752, 757 (Pa. Super. 1986) (citation omitted). Here, the PCRA court addressed Appellant's argument as follows:

> [Appellant] next contends that [trial counsel] was ineffective for failing to properly cross-examine [Mother] and Dr. Wayne K. Ross regarding their testimony at trial. Specifically, with respect to [Mother], [Appellant] contends that [trial counsel] failed to adequately question her regarding whether she sought proper prenatal and postnatal care for Victim, as well as questioning her regarding her mental health in the weeks leading up to Victim's death, with the goal of advancing the theory that [Mother] was responsible for Victim's death. With respect to Dr. Ross, [Appellant] contends that [trial counsel] failed to question him regarding the Commonwealth's timeline of events, pointing out that the evidence of Victim's antemortem blindness was not reflected during a doctor's visit [Mother] took Victim to on the day before her death. [Appellant] submits that evidence would call into question the findings by Dr. Ross and bring his credibility into doubt.

> Regarding [Mother], the record reflects first that [trial counsel] did cross-examine her regarding whether she properly sought postnatal care for Victim. Notably, [trial counsel] introduced testimony that [Mother] failed to bring Victim to several postnatal care appointments, and that a letter reflecting those failures was mailed to her by Victim's doctor's office. Because this testimony was part of the record and available for the jury to consider, [trial counsel] was not ineffective for failing to cross-examine [Mother] regarding her purported failure to seek proper postnatal care.

> Regarding the failure of [Mother] to seek proper prenatal care for Victim, as well as [Mother] self-reporting feelings of depression prior to Victim's death, [Appellant] failed to meet his burden to demonstrate that he is entitled to relief. [Appellant] failed to show that this claim had arguable merit, failed to show that [trial counsel] lacked a reasonable basis for failing to cross-examine [Mother] regarding prenatal care and her mental health, and failed

- 13 -

to show that he suffered prejudice as a result. In terms of arguable merit, [Appellant] failed to demonstrate that there was any connection between [Mother]'s failure to seek proper medical care for Victim, or her mental health prior to Victim's death, and the traumatic asphyxiation of Victim, which occurred while [Mother] was in New Jersey. Regarding [trial counsel's] reasonable basis in not pursuing this line of questioning, [Appellant] failed to demonstrate that the failure by [Mother] to receive proper prenatal medical care was anything but repetitive of her failure to ensure that Victim received proper postnatal medical care, which was placed on the record for the jury to consider. [Appellant] also failed to demonstrate that [trial counsel] lacked a reasonable basis for not cross-examining [Mother] regarding her feelings of depression in the weeks leading up to Victim's death. Notably, the autopsy demonstrated that Victim's cause of death was either suffocation or traumatic asphyxiation, and it was uncontested that Victim passed away while [Mother] was in New Jersey, making the lack of prenatal medical care and [Mother's] mental health irrelevant to Victim's demise. Likewise, [Appellant] failed to demonstrate that he suffered any prejudice from [trial counsel] failing to pursue this line of questioning, as again, it was uncontested that Victim passed away while [Mother] was in another state. Therefore, [trial counsel] was not ineffective for failing to cross-examine [Mother] regarding prenatal and postnatal medical care for Victim, as well as her mental health in the weeks leading up to Victim's death.

Regarding Dr. Ross, [Appellant] focuses his challenge on the testimony that Victim was blinded in the 24 to 48 hours preceding her death, while the doctor's notes from an appointment the day before her death did not document that Victim was blind or note that she had any problems with her eyesight. [Appellant's] theory was that if Dr. Ross was incorrect about the blindness, it would call into question his other conclusions about Victim's death. Challenging Dr. Ross' conclusions regarding Victim's death does present an issue of arguable merit, as it could call into doubt [Appellant's] culpability for Victim's retinal bleeding and blindness, clearing the first prong of the [test for ineffectiveness] *i.e.*, that the underlying claim had arguable merit.

However, the record reflects that [trial counsel] did inquire into Victim's blindness, with Dr. Ross testifying that he needed to perform the autopsy of Victim to discover it. Specifically, Dr. Ross stated that he needed to remove and then dissect Victim's eyes to reveal the bleeding and blood clots in her retinas that rendered

her blind. Further, Dr. Ross testified that the presence of blood in the retinas, rather than iron deposits left by older, healed injuries, indicated that the blindness occurred within 24 to 48 hours prior to death, and not that the injury happened at least 24 to 48 hours before death, as [Appellant] argues. Because the testimony and evidence at trial demonstrated that Dr. Ross' findings were consistent with the report from Victim's doctor's appointment from the day before her death, [trial counsel] acted reasonably based on the information available to him at trial.

Additionally, [Appellant] failed to demonstrate that he was prejudiced by the testimony regarding Victim's blindness, as the ultimate medical conclusion was that the fatal asphyxia began approximately five minutes prior to death, and [Appellant] did not present any evidence challenging that conclusion. Instead, all the testimony and evidence submitted at trial was consistent with Victim being alive when [Appellant] took over caring for her, and that Victim passed away while in [Appellant's] custody due to injuries she sustained. Importantly, this finding tracks with the doctor's report that [Appellant] attempted to rely on, because that report reflected that Victim was in relatively good health while with [Mother]. Therefore, [Appellant] failed to meet his burden with respect to the cross-examinations of [Mother] and Dr. Ross, and he is not entitled to relief on this claim.

PCRA Ct. Op., 1/4/23, at 12-15 (footnotes omitted).

We conclude that the PCRA court's findings are supported by the record and free from legal error. *See Sandusky*, 203 A.3d at 1043. The record reflects that the cause of Victim's death was suffocation or traumatic asphyxiation, and it was uncontested that Mother was in another state when Victim died. We agree with the PCRA court that cross-examination concerning pre- and post-natal care was immaterial to casting blame on Mother, therefore Appellant's claim lacks merit.

With respect to Dr. Ross, the record reveals that Victim was alive when Appellant began caring for her, and that Victim's blindness occurred **within**

- 15 -

24 to 48 hours prior to death, as opposed to **more than** 24 to 48 hours before Victim's death. *See* N.T. Trial, 10/30/17-11/3/17, at 381. Further, trial counsel did question Dr. Ross about Victim's blindness. *See id.* at 404-05. Dr. Ross testified that an autopsy was necessary to discover Victim was blind and to see the bleeding in Victim's retinas. *See id.* at 380-81, 404-405, 414. There is no merit to Appellant's claim that Dr. Ross overlooked the Victim's blindness. Rather, Dr. Ross specifically testified that he had to remove and dissect Victim's eyes to uncover the bleeding and blood clots in her retinas that rendered Victim blind, and that the injuries occurred within 24 to 48 hours of the Victim's death.

On this record, we conclude that that Appellant has failed to establish that trial counsel was ineffective in his cross-examination of Mother or Dr. Ross. *See Sandusky*, 203 A.3d at 1043; *Molina*, 516 A.2d at 757. Appellant is not entitled to relief on these claims.

### Direct Examination

In his final issue, Appellant argues that trial counsel was ineffective when he questioned Appellant's father, Douglas Kohr, who testified for the defense. Appellant's Brief at 22. Appellant contends that trial counsel was not prepared to elicit testimony from Douglas Kohr concerning Appellant's parenting skills, Mother's behavior toward Victim, and the fact that Appellant was not "overwhelmed" by Victim's needs and that Appellant was not an "overwhelmed" parent. *See id.* at 22-23.

The Commonwealth argues that trial counsel was not ineffective in pursuing this line of questioning, and trial counsel's strategy was reasonable. Commonwealth's Brief at 18. The Commonwealth notes that if trial counsel had pursued the idea that Appellant was not overwhelmed, "it would have opened the door for the Commonwealth to change strategies and paint Appellant as a cold, premeditating killer, and would help establish the elements necessary for first-degree murder." *Id.*

The PCRA court addressed this issue as follows:

At the PCRA hearing, Douglas Kohr testified that prior to Victim's death, [Appellant] had not been at the house for seven weeks, but that he (Douglas Kohr) and his wife "were there every day" and "knew [Victim] was sick." Specifically, Douglas Kohr said that [Appellant] was staying in a room at "Old Fashioned Heat"[2] for the seven and half weeks prior to Victim's death, returning the Wednesday before she died. Mr. Kohr said that he was "pretty positive" that he had given this information to [trial counsel] before he testified.

According to the evidence produced at trial, Victim was taken to the hospital on Saturday, May 14, 2016. Crediting Douglas Kohr's testimony as truthful, [Appellant] was still at the house for four days with [Victim], Wednesday through Saturday; before she was taken by ambulance [to a hospital] and ultimately pronounced dead. Furthermore, [Mother] took [Victim] to the doctor's office on Friday, the day before [Victim] died, and none of the injuries discovered in the autopsy were observed or recorded by Victim's physician. [Mother] then left for Atlantic City, leaving [Victim] with [Appellant], where she died approximately 24 hours later. The absence of [Appellant] from Victim's presence in the seven

_____

[2] "Old Fashioned Heat" is a chimney cleaning and wood stove installation company in New Cumberland, Pennsylvania, and it is Douglas Kohr's employer. *See* N.T. Trial, 10/30/17-11/3/17, at 431. The record reveals that Appellant rented a room in the same building as Old Fashioned Heat. *See* N.T., 9/22/22, at 96.

weeks prior to her death is irrelevant in the face of the evidence that he was present with her in the four days immediately preceding her death.

Douglas Kohr also testified at the PCRA hearing that he and [Appellant's] mother were in the area during the days leading up to Victim's death, and [Appellant's] mother actually was at the house with [Appellant] and Victim until around ten o'clock on Friday evening before her death. [Appellant] argues that the availability of his family to help him with Victim's care is significant, because one of the Commonwealth's arguments was that [Appellant] was overwhelmed by caring for Victim, and those feelings led to his inflicting the injuries which ultimately caused her death.

The court is not convinced that Douglas Kohr's testimony, as he testified at the PCRA hearing, would have aided [Appellant] at trial. While he testified that [Appellant] was not involved with Victim for almost two months prior to her death, Douglas Kohr also testified that [Appellant] returned to the house with Victim for the four days leading up to her death, including the 24 hours before her death, when she was in [Appellant's] primary care. That time frame was consistent with Dr. Ross' findings that the injuries leading to Victim's blindness were inflicted no more than 24 to 48 hours prior to death, and that the fatal asphyxiation began within approximately five minutes prior to death, when [Appellant] was directly caring for Victim. Clearly, this testimony is not necessarily exculpatory, and [trial counsel's] decision not to elicit this testimony from [Douglas Kohr] was not unreasonable, nor was the lack of this testimony so prejudicial as to have denied [Appellant] a fair trial. Therefore, [Appellant] is not entitled to relief on this claim.

PCRA Ct. Op., 1/4/23, at 16-18 (footnotes omitted).

We discern no error in the PCRA court's conclusion. The record reflects that trial counsel questioned Douglas Kohr to show that Appellant provided Victim food, played with her, and cared for her prior to her death. *See* N.T. Trial, 10/30/17-11/3/17, at 432. We discern no prejudice to Appellant by trial counsel not questioning Douglas Kohr about Appellant's parenting skills,

Mother's behavior toward Victim, and whether Appellant was an overwhelmed parent, because we cannot conclude that if Douglas Kohr testified to the claims Appellant now raises, the result of the trial would have been different. **See Sandusky**, 203 A.3d at 1043-44. The evidence at trial revealed that Mother was out of town, Victim was uninjured when she was first placed in Appellant's care, and Victim was in Appellant's care when the fatal injuries occurred. Further, we agree with the PCRA court that on this record, Douglas Kohr's observations concerning Appellant's whereabouts in the two months preceding Victim's death are not exculpatory because the fatal asphyxiation began within approximately five minutes prior to death, when Appellant was directly caring for Victim. Additionally, trial counsel testified that if he argued that Appellant was not an overwhelmed parent, it might have precluded the third-degree murder conviction, which could have resulted in Appellant's conviction for first-degree murder. **See** N.T., 9/22/22, at 57. On this record, we conclude that Appellant is not entitled to relief.

## Conclusion

For the reasons set forth above, Appellant is not entitled to relief on his claims. Accordingly, we affirm the PCRA court's order.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/28/2023